UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION


ASHLEY SEAY,                              CIVIL ACTION
        Appellant                         NO. CV07-1454-LC

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER           JUDGE JAMES T. TRIMBLE
OF SOCIAL SECURITY,                       MAGISTRATE JUDGE JAMES D. KIRK
        Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Ashley Seay ("Seay") filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") on February 17, 2005, alleging a disability onset date of April 1, 2004 (Tr. pp. 41, 279). Those applications were denied by the Social Security Administration ("SSA") (Tr. pp. 34, 282).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on April 24, 2007, at which Seay appeared with her attorney, a witness, and a vocational expert ("VE") (Tr. p. 228). The ALJ found that, although Seay suffers from severe "asthma, endometriosis, degenerative disc disease, irritable bowel syndrome, and affective disorder," she has the residual functional capacity to perform sedentary work with a sit/stand option and, therefore, can perform her past relevant work as an accounts payable clerk and

data entry clerk (Tr. pp. 16-21). The ALJ concluded that Seay was not under a disability as defined in the Social Security Act at any time through the date of the ALJ's decision on May 22, 2007 (Tr. p. 22).

Seay requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 5), and the ALJ's decision became the final decision of the Commissioner of Social Security.

Seay then filed this appeal for judicial review of the Commissioner's final decision. The sole issue raised by Seay on appeal is whether the vocational expert's testimony, on which the ALJ relied, is based on a defective hypothetical.

Seay and the Commissioner each filed a brief. Seay's appeal is now before the court for disposition.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must

meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the

3

evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## Summary of Pertinent Facts

Seay was 28 years old at the time of her administrative hearing (Tr. p. 292), graduated from high school, earned an associates degree in computers and an associates degree in business administration (Tr. p. 293), and has past relevant work experience as a data entry clerk and a file clerk at a hospital, a secretary, an accounts payable clerk, and a customer service representative at a retail store (Tr. pp. 292-294).

1. Medical Records

In February 2001, Seay was examined by Dr. R.K. Mangal, a gynecologist, for complaints of severe pain with her menses (Tr. pp. 178-180).  Dr. Mangal diagnosed severe dysmenorrhea, endometriosis, dyspareunia,[1] and pelvic pain (Tr. p. 179).  Dr. Mangal performed a laparoscopy, cauterized the endometriosis, did a presacral neurectomy, and a chromopertubation (Tr. p. 187).  Dr. Mangal's post-operative diagnosis was severe dysmenorrhea, endometriosis, dyspareunia, pelvic pain, and salpingitis[2] isthmic nodosa (Tr. pp. 187-189).

In March 2002, Dr. Don C. Quast, a thoracic surgeon, examined Seay on referral from Dr. Franklin (Seay's gynecologist), for pain in her right groin that was progressive and went down the anterior aspect of her leg, suggesting a femoral type defect (Tr. p. 137).  Dr. Quast also noted palpable weakness that had progressed and stayed tender, and recommended a herniorrhaphy (Tr. pp. 137-138).  Dr. Quast performed a right inguinal (or femoral) herniorrhaphy to repair Seay's femoral hernia in April 2002 (Tr. pp. 145-146).

---

[1] Dyspareunia is difficult or painful intercourse. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Dyspareuniat, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[2] Salpingitis is a pelvic inflammatory disease of the lining of the uterus, the fallopian tubes, or the ovaries.  MEDLINEplus Health Information, Medical Encyclopedia: Salpingitis, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health)

In July 2002, Seay was examined by Dr. Randolph W. Evans, a neurologist (Tr. p. 226). Dr. Evans noted Seay's history of severe endometriosis; an EMG and a nerve conduction velocity study of Seay's lower extremities were normal (Tr. pp. 227, 230). Dr. Evans stated Seay's history of frequent (daily) migraines may be due to the frequent use of the medication Norco (Tr. pp. 227). Dr. Evans planned an MRI of the brain and lumbar spine, injected a left L5 paraspinal trigger point with lidocaine, recommended tapering off Norco and caffeinated beverages, and prescribed Elavil and Baclofen for pain, and Maxalt for headaches (Tr. p. 227). An MRI of Seay's lumbar spine showed degenerative disc disease at L4-5 with mild facet arthropathy at that level, and some circumferential disc bulge at L5-S1 and L4-5, without central peripheral stenosis (Tr. p. 228). The MRI of Seay's brain was normal (Tr. p. 229).

On February 17, 2003, Dr. Quast again examined Seay (Tr. pp. 89-90). Dr. Quast noted Seay's history of endometriosis and past herniorraphy with postoperative neurologic pain, with tenderness at the hernia repair site (Tr. p. 89). On February 18, 2003, a laparoscopy was performed by Dr. Quast, who found a femoral herniorrhaphy scar on the right which was slightly tender over the area (Tr. p. 89). Seay was diagnosed with right-sided pelvic pain, endometriosis, pelvic adhesive disease, and dyspareunia (Tr. pp. 82, 95). Seay was also diagnosed with possible right inguinal nerve entrapment (Tr. pp. 102, 112). Seay then underwent a neurolysis for the inguinal nerve entrapment, lysis of the peritoneal adhesions, and excision (vaporization) of the

6

endometriosis lesions (Tr. pp. 87, 99-103).

In April 2003, Seay saw Dr. Robert R. Franklin, her gynecologist, for complaints of pain down the lower right side of her back that radiated down the front of her leg (Tr. p. 243). Dr. Franklin noted Seay's well-healed abdominal incisions, discussed the surgery with her, and referred her to Dr. John R. Mathias a neurogastroenterologist (Tr. p. 243).

In April 2003, Dr. Mathias noted Seay's symptoms were improved since she stopped taking Neurontin, but she had pain in her lower back which interfered with sleep (Tr. p. 259). Seay stopped taking Lupron and her pain returned (Tr. pp. 147-252). In April 2005, Dr. Mathias stated in a letter that Seay has severe endometriosis and associated enteric[3] nerve dysfunction and, though her disease is well-controlled by Lupron, she cannot afford it and is totally disabled without that medication (Tr. p. 247).

In June 2005, Dr. Tosheiba Holmes, a physical medicine and rehabilitation doctor, examined Seay at the request of Disability Determinations Services (Tr. pp. 232-235). Dr. Holmes noted her complaints of endometriosis, irritable bowel syndrome, hernia, right leg giving out, and asthma Tr. p. 235). Dr. Holmes diagnosed a history of endometriosis with multiple surgeries, a history of chronic abdominal pain secondary to endometriosis and possibly to

---

[3] Enteric means "of, relating to, or affecting the intestines." MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: "Enteric," *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

7

irritable bowel syndrome, a history of irritable bowel syndrome with intermittent constipation and diarrhea, chronic pelvic and low back pain since her surgeries and hernia repairs, a history of asthma that is very well controlled, and a history of multiple cervical procedures for precancerous cells (Tr. p. 235).

In July 2006, Dr. Mathias noted Seay was again taking Lupron and doing better (Tr. p. 273). Dr. Mathias referred Seay to Dr. Franklin again for a laparoscopy (Tr. p. 273).

In August 2006, Dr. Franklin wrote that he had been treating Seay since August 2004 for pelvic pain radiating to her back and severe dysmenorrhea (Tr. p. 276). Dr. Franklin stated that he believed Seay to be suffering from endometriosis, cervical pathology, and bowel neuropathy, and had referred Seay to Dr. Mathias (Tr. p. 276). Since Seay's pelvic pain continued, she underwent inguinal hernia repair with Dr. Quast in February 2003, as well as removal of her endometriosis, but her right side pain returned by April 2003 (Tr. p. 276). Seay continued to see Dr. Mathias for bowel neuropathy and resulting pain, and Dr. Franklin deferred to him as to Seay's ability to perform work-related physical activities (Tr. p. 276).

## 2. 2007 Administrative Hearing

At her administrative hearing, Seay testified that she was 28 years old, was not married and did not have children, lived with her mother, did not work, and did not have any income (Tr. p. 292). Seay further testified that she had worked at a medical center as a file clerk and a data entry clerk for about seven months (Tr. pp.

8

292-293), and had also worked as a secretary and in accounts payable at another company for about two years (Tr. p. 293). Prior to working, Seay spent four years in college, during which time she worked part time at a daycare center (Tr. p. 293). Seay completed associate degrees in computers and business administration (Tr. p. 293).

Seay testified that, before she went to college, she worked at J.C. Penney for six to nine months, and quit when she had her first surgery for endometriosis (Tr. p. 294). Seay testified that she later quit working at the medical center because her doctors told her she could not work anymore, even though her employer accommodated her need to sit and stand at will (Tr. pp. 294-295).

Seay testified that she has had four surgeries and has not worked since 2002 (Tr. p. 295). All four surgeries were for endometriosis, two of the surgeries also involved hernia repairs, and one of the surgeries also involved removal of about three inches of her bowel (Tr. pp. 310-311). Recovery time after those procedures was six to eight weeks, with no driving or lifting (Tr. p. 311). Seay also had two office procedures to remove pre-cancerous cells found in her woman's wellness check (Tr. p. 310).

Seay testified that she last saw her doctors in Houston on March 6, 2007, and they found her endometriosis was back and she has problems with her bowels, so they recommended another surgery; Seay said she cannot pay for the surgery because she is not working (Tr. p. 295). Seay testified that the new endometriosis has wrapped itself around her colon and intestines, causing problems

9

with her irritable bowel syndrome ("IBS") (Tr. p. 251). Seay testified that Dr. Franklin and Dr. Mathias both told her that she has a severe, aggressive case of endometriosis that will constantly return, and all they can do is remove the lesions and adhesions (Tr. p. 312). Seay further testified that having a hysterectomy would not help because the endometriosis attaches itself to her intestines, bowel, and colon instead of her uterus, so her doctors have not recommended that surgery (Tr. p. 316).

Seay testified that she takes Norco for pain, Klonopin for her IBS, Actos for hypoglycemia, amitriptyline and Xanax for anxiety, depression, and to help her sleep, and a monthly shot of Lupron Depot for her endometriosis (Tr. p. 296). Seay testified that she gets some of her medications free or at reduced prices and her mother helps pay for them (Tr. p. 297). Seay testified that she is supposed to take Lupron Depot daily, but she can only get it free in a monthly injection (Tr. p. 298-299); the monthly injection does not work as well as the daily medication because the monthly injection tends to over-medicate her and make her sick at the beginning, and under-medicates her at the end of the month (Tr. pp. 312-313). Seay testified that she does not see a psychologist; Xanax is prescribed by her gastrointestinal doctor (Tr. p. 300). Seay testified that she has been taking medication for IBS since about 2001 (Tr. p. 301). Seay testified that she has medication side effects of impaired judgment and drowsiness (Tr. p. 313).

Seay testified that her pain is always between eight and ten on a scale of one to ten; her pain medication does not help at all

10

when her pain is most severe (Tr. p. 303). Seay has her most severe pain three to four days a week; on those days, she stays in bed most of the day (Tr. p. 314). Seay testified that she has pain in her lower back on the right side, her right hip, her pelvic area, her stomach, and her entire right side from the waist down (Tr. p. 303). In addition to medication, Seay uses a massager or a heating pad, or soaks in a hot tub to ease her pain (Tr. p. 302). Seay has not traveled outside of Louisiana in the last three years except to visit her doctors in Houston (Tr. p. 306).

Seay testified that she also has back, hip, and leg pain whenever anything becomes inflamed in the right side of her pelvic area and presses against her sciatic nerve (Tr. p. 301). Seay testified that happens two to three times a week (Tr. p. 314). Seay testified that, sometimes, her foot tingles as if it is falling asleep, so she knows not to stand up and walk (Tr. p. 301); if she does, her leg gives out and she falls (Tr. p. 302). Seay testified that she sometimes uses crutches to prevent falling (Tr. p. 302).

On a typical day, Seay sleeps whenever she can because she does not sleep well at night due to pain (Tr. p. 302). Seay testified that she cannot sit, stand or lie down for very long (Tr. p. 302). At night, if she cannot sleep, she may get up and watch TV (Tr. p. 302). Seay watches TV during the day, uses the computer (mostly for emailing friends) about three times a week, talks on the phone, and does laundry (Tr. p. 304). Seay goes to the grocery store, but does not carry out her own groceries (Tr. p. 302). Seay

11

testified that she does not like to go anywhere because it tires her and triggers the pain in her pelvic area and elsewhere (Tr. p. 315). Sometimes Seay's nieces and nephews visit, but only when Seay's mother is there, also (Tr. p. 305).

Seay testified that she can no longer do her past work because, even though her past employers tried to accommodate her by allowing her to change her work hours and days, take work home, and alternate sitting and standing, stress triggers her endometriosis pain, so she is always in pain and the accommodations do not help (Tr. pp. 306-308). Seay's work in accounts payable and other work were time sensitive, which caused stress and worry, which caused pain (Tr. p. 307).

Seay testified that she can sit for one to two hours at a time, stand for about an hour at a time, and lift up to five pounds (Tr. pp. 308-310). Seay testified that she can drive for up to an hour at a time (Tr. p. 302). The most exercise Seay gets is walking to the mailbox on a good day; Seay testified that her doctors told her not to do any exercising except walking or riding a bike (Tr. p. 318). Seay testified that she does not ride a bike because it hurts and, if she walks, she does so in the yard or to the mailbox (Tr. p. 318). Seay also testified that, in 2006, she helped with the Cancer Society's Relay for Life by walking for about one minute and then sitting in a booth (Tr. p. 319).

Seay's mother, Glenda Seay, testified that Seay lives with her (Tr. p. 317). Glenda Seay testified that Seay is incapable of moving or walking around for a normal day of work, and that Seay

12

stays in bed two or three days at a time (Tr. p. 317). Glenda Seay testified that Seay has some good days when she gets out and goes to see her friends, but Seay "pays for it" afterwards (Tr. p. 317). Glenda Seay testified that she sees pain and distress on Seay's face, then Seay stays in her room, takes her medication, and only comes out to eat, go to the restroom, and bathe (Tr. pp. 317-318).

The VE testified that Seay's past work as a customer service representative in retail (J.C. Penney's) was light, semi-skilled work, her accounts payable work was sedentary, skilled, her work as an admissions clerk was sedentary, semi-skilled, her work as a file clerk was light, semi-skilled, and her work as a data entry clerk was sedentary, semi-skilled (Tr. p. 320). The ALJ posed a hypothetical question involving a person of Seay's age and education, who can lift twenty pounds occasionally and ten pounds frequently, can sit/stand/walk for six hours in an eight hour day, has an unlimited ability to push/pull, has no limitations in gross and fine motor skills, can have only limited exposure to dust, fumes, gases, and chemicals, has the ability to get along with others, can understand detailed instructions, concentrate, and perform detailed tasks, and can respond and adapt to work place changes and supervision (Tr. pp. 320-321). The VE testified that a person with those limitations and abilities could perform all of Seay's past relevant work (Tr. p. 321).

The ALJ posed a second hypothetical question involving a person with an exertional ability to occasionally lift up to ten pounds and frequently lift five pounds, who must have a sit/stand

13

option, and who can walk four hours in an eight hour day (Tr. p. 321). The VE testified that such a person can perform Seay's past work as a customer service representative, an accounts payable clerk, or a data entry clerk, but could not work as an admission clerk (Tr. p. 321).

The VE further testified that, if the person could not go to work every day due to pain and would miss three or more days per month repetitively, "competitive employment" would be eliminated (Tr. p. 322). If the person has to take work breaks beyond the normal fifteen minute morning and afternoon break and thirty minute lunch break, "competitive employment" would be eliminated (Tr. p. 322). Finally, if the person must take pain medication that prevents her from thinking clearly or makes her sleepy or drowsy, she would not be able to maintain employment (Tr. pp. 322-323).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Seay (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and

14

terminates the analysis. <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. <u>Greenspan</u>, 38 F.3d at 237.

In the case at bar, the ALJ found that Seay has not engaged in substantial gainful activity since April 1, 2004, her disability insured status expired on December 1, 2005, and she has severe impairments of asthma, endometriosis, degenerative disc disease, irritable bowel syndrome, and affective disorder, but she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 16, 22). The ALJ then found that, from April 1, 2004 through of May 22, 2007, Seay had the residual functional capacity to perform sedentary work with a sit/stand option and was able to understand detailed instructions, concentrate on and perform detailed tasks, and respond and adapt to changes in the workplace and supervision, so she was still able to perform her past relevant work as a data entry clerk and an accounts payable clerk (Tr. p. 22). The sequential analysis thus ended at Step 4, with a finding that Seay

15

was not disabled (Tr. p. 22).

Issue - Vocational Expert Testimony

Seay contends the vocational expert testimony, which was relied on by the ALJ in his decision, was based on a defective hypothetical question. Seay argues the hypothetical question failed to incorporate all of her limitations because it did not include her moderate limitations in concentration, persistence, and pace caused by her affective disorder, as found by the ALJ in his decision.

Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions, a determination of non-disability based on such a defective question cannot stand. Boyd v. Apfel, 239 F.3d 698, 706-707 (5th Cir. 2001), citing Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994).

In the case at bar, the ALJ stated in his analysis of Seay's affective disorder, in determining whether Seay meets the listing level severity for depression, that Seay suffers from difficulties sleeping and has had some moodiness and crying spells, but she has only mild restrictions in activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace

16

(Tr. p. 17). Thus, Seay contends that, while the ALJ found she did not meet the listing level severity for an affective disorder, he made findings as to her limitations of functioning which he failed to incorporate in his hypothetical question to the VE.

The ALJ stated in his hypothetical that the person "can understand detailed instructions and concentrate and perform detailed tasks, and can respond and adapt to work place changes and supervision," but failed to incorporate her mental limitations as to daily living, social functioning, and maintaining concentration, persistence, or pace (Tr. p. 22). Seay contends the ALJ's hypothetical is, therefore, inconsistent with her limitations as set forth by the ALJ in his decision. Seay argues that the ALJ essentially found she has, at the most, a reasoning level of two (as set forth in the Dictionary of Occupational Titles), while the job of customer service representative requires a reasoning level of three and the job of accounts payable clerk requires a reasoning level of four.

Level two reasoning requires the worker to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations. Dictionary of Occupational Titles, Appendix III, "02 Level Reasoning Development," *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

Reasoning level three is defined as the ability to apply commonsense understanding to carry out instructions furnished in

17

written, oral, or diagrammatic form, and deal with problems involving several concrete variables in or from standardized solutions. Dictionary of Occupational Titles, Appendix III, "03 Level Reasoning Development," *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

Reasoning level 4 requires the worker to apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists, and interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. Examples of rational systems include: bookkeeping, internal combustion engine electric wiring systems, house building, farm management, and navigation. Dictionary of Occupational Titles, Appendix III, "04 Level Reasoning Development," *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

The Fifth Circuit has found that mild difficulties in daily living and in maintaining social functioning, combined with moderate deficiencies of concentration, persistence, or pace, are not incompatible with the performance of jobs requiring a reasoning level of three. See Gutierrez v. Barnhart, 2005 WL 1994289, *9 (5th Cir. 2005).

It appears the ALJ erred by failing to incorporate Seay's mental limitations as to social functioning and concentration, persistence, or pace in his hypothetical questions to the VE. However, since Seay's past relevant work as a customer service representative (also known as an order clerk) and as a data entry

18

clerk both have level three reasoning requirements, those jobs are not inconsistent with Seay's ability to work. Therefore, the ALJ's failure to include Seay's mental limitations in the hypothetical question is harmless error.

Substantial evidence supports the ALJ's/Commissioner's conclusion that Seay can perform her past relevant work as a customer service representative or as a date entry clerk. Seay's argument on appeal is meritless.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Seay's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND**

**LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 16th day of October, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE